# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-02896

JEFFREY INEN,

Plaintiff,

v.

THE UNIVERSITY OF COLORADO, through its Governing Body,
THE REGENTS OF THE UNIVERSITY OF COLORADO, a body corporate,

Defendant.

## COMPLAINT AND JURY DEMAND

The Plaintiff, Jeffrey Inen, by and through counsel, for his Complaint and Jury Demand against The University of Colorado (the "University"), states as follows:

## NATURE OF THE ACTION

This action is brought to redress the University's violation of the Rehabilitation Act of 1973, 29 U.S.C. §701, *et seq.* (the "Rehabilitation Act"), and under section 504, 29 U.S.C. §794, in particular. Specifically, the Plaintiff alleges that the University discriminated against him based on his Disabilities and retaliated against him for requesting reasonable accommodations related to his Disabilities, all in violation of the Rehabilitation Act.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343 and the Rehabilitation Act, §§504 and 505, 29 U.S.C. §§794 and 794a. The unlawful employment practices alleged herein were committed within the jurisdictional boundaries of the United States District Court for the District of Colorado and venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

## ADMINISTRATIVE PREREQUISITES / RELATED PREVIOUS CASE

2. To the extent that there were procedural prerequisites for bringing Rehabilitation Act claims, Plaintiff complied with any such procedural prerequisites for bringing this lawsuit before commencing the current litigation.

3. On December 22, 2021, within 300 days of the subject discriminatory and retaliatory conduct set forth herein, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

4. By notice dated June 2, 2022, Plaintiff was issued a Dismissal of Charge and Notice of Right to Sue ("Notice") by the EEOC.

5. Plaintiff's original Complaint against the University, captioned *Inen v. University of Colorado,* Civil Action No., 1:22-cv-02167-PAB-NRN (the "Related Previous Case"), was filed within ninety (90) days following his receipt of the Notice.

6. On or about May 10, 2023, the parties stipulated to the voluntary dismissal without prejudice of the Related Previous Case.

7. Pursuant to a tolling agreement between the parties, Plaintiff reserved the right to reopen his claims against the University that were set forth in the Related Previous Case, so long as he did so on or before November 1, 2023.

8. Having now filed the instant Complaint on November 1, 2023, Plaintiff's filing complies with the parties' tolling agreement.

## PARTIES

9. Plaintiff Jeffrey Inen ("Mr. Inen") is an individual resident of the state of Colorado with a residential address of 2200 N. Ursula Street, Apt. 241, Aurora, CO 80045.

10. Defendant, the University of Colorado, is a Colorado state institution of higher education established and regulated by Article IX, §§12 and 13 of the Colorado Constitution, as

well as by state statutory law, C.R.S. §23-20-101 *et seq.*, with a principal place of business located at 1201 Larimer St., Suite 1119, Denver, Colorado 80204.

11. The University of Colorado is supervised by Defendant The Regents of the University of Colorado, a body corporate organized under the Colorado Constitution. The office of the Secretary of the Board of Regents of the University of Colorado is located at 1800 Grant Street, Ste. 800, Denver, Colorado 80203.

12. Upon information and belief, the University employs more than 500 employees in Colorado.

## **GENERAL ALLEGATIONS**

13. Mr. Inen is a PhD student who is employed by the University.

14. Mr. Inen suffers from lupus, rheumatoid arthritis, and ankylosing spondylitis (collectively, his "Disabilities"), severe conditions that significantly limit his cognitive thinking, concentration and interaction with others and present challenges in dealing with stress, time management, focusing, recollection and organization; Mr. Inen has suffered from these Disabilities at all times relevant to this Complaint.

15. Mr. Inen is protected by the provisions of the Rehabilitation Act, as well as by the provisions of The Americans with Disabilities Act of 1990, 42 U.S.C. §§12101–12117, as amended by the Americans with Disabilities Amendments Act effective on January 1, 2009 (collectively, the "ADA").

16. The University has been aware of Mr. Inen's Disabilities at all times relevant to this Complaint.

17. Mr. Inen informed his program of his Disabilities during his first interview and when he applied to a diversity supplement grant with his then mentor, Dr. Brisa Pena-Castellanos ("Dr. Pena").

18. Dr. Pena took Mr. Inen's Disabilities into account in accepting Mr. Inen to the University.

19. Dr. Pena instructed Mr. Inen to apply to the NIH NHLBI minority supplement, noting that his Disabilities would qualify him for that grant, and she discussed this minority supplement, including Mr. Inen's disability, with the entire department.

20. When Mr. Inen received his first bill of $1,085 for his chemotherapy treatments, he had to find a way to pay for this as well as for subsequent treatments, since he was only making approximately $2,400 per month at the University.

21. Mr. Inen made it clear to the University that his chemotherapy is necessary for him to remain alive.

22. When Mr. Inen found out that he could not afford this critical chemotherapy, he began contacting numerous University representatives, including (i) the Bioengineering Department Manager, Natalie Kersten, to whom Mr. Inen specifically referenced his Disabilities in the context of their conversation, and (ii) the Department of Student Health Insurance at the Anschutz Medical Campus ("SHI"), to which Mr. Inen noted by email the existence of his Disabilities, as well as the severity of his diseases, noting that he was "facing the choice between financial ruin and staying alive."

23. At Dr. Pena's request, Mr. Inen forwarded to her his email exchange with SHI; after reviewing the emails, she remarked to Mr. Inen that "your conversation was not that bad."

4

24. Mr. Inen was also connected through CU Anschutz Shares with Janice Cannon, who served as Mr. Inen's case manager throughout the process of Mr. Inen attempting to find a way to pay for and continue to receive his chemotherapy.

25. During his initial conversation with Ms. Cannon on October 21, 2021, Mr. Inen explained his Disabilities and noted that if he does not get his chemotherapy, he would die.

26. Ms. Cannon put Mr. Inen in contact with the University's Disability Services Department.

27. The process of applying for emergency funding, Medicaid and other social services took Mr. Inen a substantial amount of time.

28. On November 10, 2021, Dr. Pena assigned Mr. Inen a substantial amount of work, which she indicated needed to be completed within two days.

29. At the time that she issued Mr. Inen's work assignment on November 10, 2021, Dr. Pena was aware that Mr. Inen was taking nine credits, almost double the course load of a typical full-time graduate student at the University; in fact, Dr. Pena had specifically recommended that Mr. Inen do so.

30. At the time that she issued Mr. Inen's work assignment on November 10, 2021, Dr. Pena was aware that the assignment was not capable of being completed by Mr. Inen within two days' time, because he was taking almost twice the normal credits of a full-time graduate student and because he had to work in order to pay for his chemotherapy.

31. Mr. Inen complained to Dr. Pena on November 10, 2021 that her work assignment of earlier that day was too much for him to handle within two days.

32. As a result, on November 10, 2021, Mr. Inen asked for reasonable accommodation from the University in the form of additional time to complete his work.

33. Mr. Inen also made a request for reasonable accommodation on November 11, 2021, as a result of being assigned to sit next to a person who was visibly ill during a lab meeting.

34. As an immunocompromised person, Mr. Inen's exposure to any virus – and particularly COVID-19 – is potentially lethal, and the room in which the lab meetings are conducted is small, so he sought accommodation through the form of being allowed not to attend such meetings in person.

35. The accommodations that Mr. Inen requested from the University were reasonable, and would not have created an undue hardship for the University.

36. Dr. Pena never responded to Mr. Inen's November 11, 2021 request for accommodation.

37. Instead, almost immediately after receiving his multiple requests for accommodation, Dr. Pena dismissed Mr. Inen from the lab on November 12, 2021.

38. Mr. Inen had only been attending the University for a little over two months at the time that he was dismissed from Dr. Pena's lab.

39. In dismissing Mr. Inen from the lab, Dr. Pena coldly remarked, "everyone has health issues Jeffrey," and "you're making excuses."

40. Mr. Inen's dismissal from Dr. Pena's lab occurred without warning, and without Dr. Pena having first gone through the committee review process that is required by University policy.

41. Dr. Pena falsely maintained that she had spoken with all of her mentors, as well as with Natalie Kersten and the Bioengineering Department, and that everyone was in agreement that Mr. Inen was not a good fit for Dr. Pena's lab.

42. As a result of the University's discriminatory and/or retaliatory acts and omissions that were carried out by Dr. Pena, Mr. Inen has suffered multiple adverse employment actions, simply as a result of his Disabilities and for having requested reasonable accommodation that he needed in order to stay alive.

43. As part of her discrimination and/or retaliation against Mr. Inen, Dr. Pena forced Mr. Inen to work additional hours in November 2021, during which period Dr. Pena imposed a more burdensome work schedule upon him.

44. As part of her discrimination and/or retaliation against Mr. Inen, Dr. Pena engaged in acts and omissions that carry a significant risk of humiliation, damage to Mr. Inen's reputation, and a concomitant harm to his future employment prospects, including negatively impacting his future employment opportunities or opportunities for advancement.

45. Mr. Inen neither had lab nor a mentor from November 12 to 29, 2021, a situation that is completely unheard of in the Bioengineering Department, and which itself was highly damaging to Mr. Inen's reputation, as this is widely regarded to be a "red flag" among the Department.

46. As part of her discrimination and/or retaliation against Mr. Inen, Dr. Pena widely disparaged Mr. Inen to others in the Department of Cardiology and recklessly disseminated confidential information about him, to the point where Mr. Inen essentially was blacklisted and could not have returned to the Department even if he had wanted to.

47. Although the University had assured Mr. Inen that this would not happen, when he met with potential principal investigators ("PIs") at the University who were outside of his Bioengineering Department, he found that these PIs already knew everything about the situation with Dr. Pena.

48. The damage to Mr. Inen's reputation caused by Dr. Pena was both immediate and profound; among other acts and omissions, Dr. Pena refused to provide a recommendation for Mr. Inen, which itself was fatal to any chance he had of securing another position in the Cardiology and Bioengineering Departments where Dr. Pena works.

49. The damage to Mr. Inen's reputation continues to adversely impact him today, since he can never collaborate with these Bioengineering or Cardiology labs again, thereby resulting in the loss of critical investigative experience in Cardiology, his chosen field.

50. As a direct result of Dr. Pena's discriminatory and/or retaliatory acts and omissions, Mr. Inen lost the opportunity to work with other PIs within the Cardiology department, and he lost the opportunity to have these PIs on his PhD committee, which he needs in order to graduate.

51. Mr. Inen has lost potential mentors within the Bioengineering Department, including Dr. Chelsea Magin in addition to losing out on critical research experience, since he is not able to visit their labs to see what fellow students are working on.

52. As a result of his reputation having been destroyed throughout the Bioengineering department, Mr. Inen does not feel comfortable interacting with the Bioengineering faculty.

53. Due to Mr. Inen's inability to request letters of recommendation from the PIs in the Bioengineering Department with whom he has been precluded from forging relationships, the University has set Mr. Inen up for failure in his PhD program and in his professional career.

54. Dr. Pena caused Mr. Inen to lose the very opportunity in Cardiology and the Bioengineering Department for which he had relocated and uprooted his life.

55. As a direct result of Dr. Inen's discriminatory and retaliatory acts and omissions, Mr. Inen has been subjected to bullying throughout the Bioengineering Department; he has also

8

been isolated and has been left off of key departmental emails, and he has been denied basic assistance by the University such as budgeting assistance.

56. Due to his Disabilities and/or in retaliation for his request for reasonable accommodation, Mr. Inen has been marginalized by the University and has not been treated equally with similarly situated graduate students who are employed by the University.

57. Upon information and belief, it was the University's very awareness of Mr. Inen's Disabilities and his requests for reasonable accommodation that played an integral role in the mistreatment and retaliation that Mr. Inen received.

58. As a direct and proximate result of the University's discrimination and retaliation against him, as described *infra*, Mr. Inen has been substantially damaged.

59. In the wake of the University's mistreatment of him in November 2021, Mr. Inen has been going to therapy twice a month due to the emotional trauma associated therewith.

60. Mr. Inen's therapy is ongoing, and it has forced him to take time away from his research and studies.

61. The overwhelming stress that has resulted from the discrimination and retaliation described *infra* has further weakened Mr. Inen's body and has exacerbated the effects of the health issues that he is battling, causing extreme pain and distress and forcing him to visit his physician more frequently to obtain additional critical prescriptions that require additional out-of-pocket expenditures.

62. The discrimination and retaliation described *infra* has exacerbated Mr. Inen's Disabilities, causing him to have to take time out of lab and his studies, which further has set him back in his PhD program, since he was forced to switch labs and learn completely different procedures and techniques for a different project.

63. The process of being left without a lab and having to secure a new position was one of the most stressful situations that Mr. Inen has ever encountered in his life; that stress has also directly contributed to Mr. Inen's health and financial issues.

64. Under these circumstances, Mr. Inen is entitled to obtain any and all relief from the University that is permitted under the Rehabilitation Act, including equitable relief.

## CLAIMS FOR RELIEF

### First Claim For Relief
### Discrimination in Violation of the Rehabilitation Act

65. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

66. The University is an entity that receives federal financial assistance and is a covered entity for purposes of §504 of the Rehabilitation Act; as such, the University is prohibited from discriminating against any "qualified individual with a disability."

67. The ADA, at 42 U.S.C. § 12132, extends the nondiscrimination rule of Section 504 of the Rehabilitation Act to services provided by any "public entity," without regard to whether the entity is a recipient of federal funds.

68. Plaintiff is a qualified individual with a disability, in that he has lupus, rheumatoid arthritis, and ankylosing spondylitis, which substantially limits one or more of his major life activities and/or major bodily functions, the University perceives him to have a disability, he has the requisite qualifications to perform and can perform the essential functions of the job for which he was hired (with or without reasonable accommodation), and he held and desired to continue to hold his job with the University.

69. The University violated section 504 of the Rehabilitation Act, 29 U.S.C. §794, by retaliating against Plaintiff through one or more adverse employment actions because of his actual disability, his perceived disability, or his record of impairment.

70. As described *infra*, the University's discriminatory actions included, but were not limited to: (i) deliberately targeting Plaintiff for mistreatment and harassment as a result of his Disabilities, (ii) limiting, segregating, or classifying Plaintiff in a way that adversely affected his opportunities or status because of his Disabilities; (iii) utilizing standards, criteria, or methods of administration that had the effect of discrimination on the basis of disability; (iv) failing to make reasonable accommodations for Plaintiff's known physical limitations, an otherwise qualified individual employee with a disability, despite the fact that doing so would not have imposed an undue hardship on the University's operation; and/or (v) denying employment opportunities to Plaintiff based on the University's need to make reasonable accommodations for his Disabilities.

71. The University's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

72. As a consequence of the University's discrimination, Plaintiff has suffered, and continues to suffer, irreparable injury and damages.

73. As a result of the University's discrimination, Plaintiff has suffered damages, including but not limited to the loss of professional opportunities, including negatively impacting his future employment opportunities or opportunities for advancement, humiliation, reputational damage, emotional distress and mental pain and anguish.

## Second Claim For Relief
### Retaliation in Violation of the Rehabilitation Act

74. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

75. Plaintiff was subjected to retaliation by the University as a result of having engaged in protected activity; specifically, for having requested that the University reasonably accommodate his Disabilities.

76. Plaintiff's protected conduct was a motivating factor in the University's retaliatory conduct, including but not limited to the decision to dismiss Plaintiff from Dr. Pena's lab, as well as its decisions to treat Plaintiff in a disparate fashion from one or more similarly situated coworkers and to engage in further harassment of Plaintiff.

77. The University's retaliation complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

78. As a consequence of the University's retaliation, Plaintiff suffered, and continues to suffer, irreparable injury and damages.

79. Plaintiff has been damaged by the University's retaliation inasmuch as he has suffered the loss of professional opportunities, including negatively impacting his future employment opportunities or opportunities for advancement, humiliation, reputational damage, emotional distress and mental pain and anguish.

### Additional Claims for Relief

80. Plaintiff reserves the right to add additional claims after discovery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the University, and award him the following relief, to the fullest extent allowed by law:

i. Actual monetary damages for all injuries suffered by Plaintiff in an amount to be determined at trial;
ii. Compensatory damages on all claims allowed by law and in an amount to be determined at trial;
iii. Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;
iv. Pre- and post-judgment interest at the highest lawful rate; and
v. Any further relief that this court deems just and proper, and any other relief as allowed by law.

## JURY TRIAL DEMAND

Plaintiff demands for a trial by jury on all issues so triable.

Respectfully submitted this 1st day of November 2023.

        MILLER & LAW, PC

        **/s/ David J. Meretta**
        David J. Meretta, No. 44409
        1900 W. Littleton Blvd.
        Littleton, CO 80120
        (303) 722-6500
        (303) 722-9270 fax
        djm@millerandlaw.com

        ATTORNEYS FOR PLAINTIFF